JAMES P. KEMP, ESQUIRE
Nevada Bar No. 006375
KEMP & KEMP
624 N. Rainbow Blvd.
Las Vegas, NV  89107
(702) 258-1183/258-6983(fax)
jp@kemp-attorneys.com
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
***

KAREN GERVING,                                )
                              Plaintiff,      )
                                              )
vs.                                           )     Case No.:  2:06-CV-00640-BES-PAL
                                              )
OPBIZ, LLC, d/b/a ALADDIN RESORT              )
AND CASINO,  Does I-X and Roe Business        )
Entities I-X,                                 )     **PLAINTIFF'S OPPOSITION TO**
                                              )     **DEFENDANT'S MOTION FOR**
                              Defendants       )     **SUMMARY JUDGMENT**
                                              )
                                              )
                                              )
_____)

        COMES NOW the Plaintiff by and through his counsel, JAMES P. KEMP, ESQ., and hereby

opposes the Defendant's Motion for Summary Judgment.  The Plaintiff submits that there are material

issues of fact in dispute that require trial.

        This Opposition is made upon the papers and pleadings on file herein, affidavits submitted, the

attached points and authorities, and such oral argument as the Court may entertain at the hearing of the

matter.

        DATED February 12, 2007.

                                        _____/s/ James P. Kemp_____
                                        JAMES P. KEMP, ESQUIRE
                                        Nevada Bar No. 006375
                                        624 N. Rainbow Blvd.,
                                        Las Vegas, NV 89107
                                        (702) 258-1183
                                        Attorney for Plaintiff

# **INTRODUCTION**

In this case Plaintiff Karen Gerving has raised three (3) claims against her former employer Defendant OpBiz, LLC:   1) Gender Discrimination in Employment under state and federal law; 2) Retaliation under state and federal law; and 3) Breach of Contract.  Karen's claims arise out of Defendant's termination of her employment on or about March 22, 2005.  She alleges that her supervisor James Lauster, Vice President of Sales in the convention sales department discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964.  Mr. Lauster discriminated against Karen after making stereotyped  comments to her about women, and particularly women with small children, in the workplace.  He specifically told Karen, among other misguided things, that after she married a man with small children whom she assumed motherly duties for, that she was no longer qualified to be a National Sales Manager at the Aladdin.  This, according to Mr. Lauster, was because a woman with small children would not be attentive enough to her duties, not be driven to be a top performer, and should simply make raising the children her full time job.  Mr. Lauster told Karen that he intended to see to it that she would be set up for failure and fired within 30 days of the conversation he had with her on August 2, 2004.

When Karen complained to the HR department at the Aladdin about the stereotyped and discriminatory lecture she had received from James Lauster, the HR department covered for Lauster and swept the matter under the rug. Instead of doing a proper investigation of Lauster, the HR department instead supported Lauster and on August 17, 2004 Karen was given a written "coaching document" for alleged performance issues.  Lauster got very angry about Karen having reported to HR his gender stereotype lecture that he gave Karen on August 2, 2004.  Lauster then, within ten days of the August 17 coaching document, inside the 30 day window that Lauster had threatened, Lauster and Director of Sales Maureen Robinson (who also harbors and shares Lauster's misguided gender

stereotypes about women with children and children generally) prepared a termination document dated August 25, 2004.  Lauster and Robinson could not get the HR department and/or the president of the company to go along with the termination at that time due to new management coming in on September 1, 2004.  Karen had no idea that Lauster and Robinson had actually prepared this termination document until this litigation turned it up in discovery.  However, after new management took over Lauster continued to be a Vice President and continued to treat Karen poorly.  Finally, in March 2005 Lauster was finally able to push Karen's termination through and he did so not only due to his discriminatory stereotypical views of working mothers with family responsibilities, but also in retaliation for Karen opposing his illegal discrimination.

Finally, Karen has brought a breach of contract action to recover her earned and unpaid paid time off (PTO) pay that the Defendant refused to pay when she was fired.  The Defendant's HR representative told Karen that her earned PTO was forfeited because it was customary on the Las Vegas Strip to not pay accrued vacation pay to terminated employees.  Employees who resign and give notice are paid their PTO that they have earned.  Karen maintains that she earned the PTO and is entitled to receive it and the Defendant's forfeiture is void as against public policy as a penalty.

The Defendant has brought a motion for summary judgment.  This motion should be denied. There are many disputed issues of material fact in this case and the liability of OpBiz, LLC. and the extent of that liability will be dependant on the resolution of the fact issues.

## POINTS AND AUTHORITIES

## I.     STATEMENT OF FACTS.

The following statement of facts is supported by the following Exhibits: as well as the other exhibits containing excerpts of deposition testimony and documents.

    1.     Affidavit of the Plaintiff, Karen Gerving;
    2.     Affidavit of Phyllis Johnson;
    3.     Affidavit of Kadiatu "Kadija" Tejan;

4.   Transcript of Unemployment appeal Hearing # V-05-A-03289, Vol. 1;
5.   Transcript of Unemployment appeal Hearing # V-05-A-03289, Vol. 2;
6.   Deposition of James Lauster;
7.   Deposition of Maureen Robinson;
8.   Deposition of Tara Wolff;
9.   Deposition of Stacey Briand;
10.  Deposition of Tracy Gniewek (formerly Sapien);
11.  Deposition of Carrie Messina, on behalf of OpBiz, LLC.;
12.  Deposition of Michelle Marsee;
13.  Handwritten notes of Stacey Briand from August 12, 2004 meeting with Karen Gerving;
14.  Handwritten notes of Stacey Briand from August 17, 2004 meeting with Karen Gerving, Jim Lauster, Maureen Robinson and Tracy Sapien (Gniewek);
15.  Statement, dated June 1, 2005, from Jerri Sandman regarding the CLT/Sanofi-Aventis account complaint letter;
16.  Positive letters, emails and notes from Karen Gerving's customers;
17.  January, 2004 coaching Document with responsive comments from Karen Gerving;
18   Karen Gerving's July, 2004 Annual Review;
19.  August 17, 20045 Coaching Document with responsive comments from Karen Gerving;
20.  August 25, 2004 Termination Notice;
21.  March 18, 2005 Coaching Document with responsive comments from Karen Gerving;
22.  March 21, 2005 Termination Notice;
23.  Affidavit of Geraldine "Jerri" Sandman;
24.  Defendant's Response to Requests for Interrogatories;
25.  Defendant's Response to Request for Production of Documents;
26.  Defendant's responses to Requests for Admissions;
27.  Handwritten notes of Stacey Briand from August13th, 6th and 9th;
28.  Karen Gerving's next to last payroll stub showing cumulative PTO;
29.  Time Line presented to NERC by Karen Gerving;
30.  Emails and spreadsheet related to Sanofi-Aventis Attrition;
31.  Email related to Mature Health Attrition;
32.  Karen Gerving's responsive comments to the Mature Health complaint letter;
33.  NERC Charge of Discrimination;
34.  NERC Permission to Sue letter.

Pursuant to FRCP Rule 56 (c) and (e), a point by point discussion of the factual disputes as to the allegations contained in Defendant's motion is attached to and made part of Karen's affidavit (Ex. 1) and is incorporated here by reference.

**A.  Background**

On or about January 18, 2001, Plaintiff Karen Gerving was hired as a National Sales Manager for Defendant's predecessor the then owner and operator of the Aladdin Resort and Casino, and

4

continued her whole employment in that position until her termination on March 21, 2005 by James Lauster, Vice President of Sales for Defendant, OpBiz, LLC.  (Ex. 1) Karen's job duties included a sales process of responding to leads, solicitation of new contacts and building relationships for booking events at the Aladdin. (Ex. 1) These duties included traveling to regional markets and occasionally even out of the country to maximize sales production. (Ex. 1) Karen's region was the northeastern United States.  (Ex 1.) This was a very tough market for Karen, or any salesperson, at the time Karen worked at the Aladdin for three reasons: 1) its geographic distance from Las Vegas; 2) the slowdown in convention business throughout Las Vegas after September 11, 2001 (less than one year after Karen started); and 3) the Aladdin's chapter 11 bankruptcy case that the hotel was operating under during most of Karen's employment. (Deposition of Gerving)  Nonetheless, Karen's sales performance and numbers were relatively good considering that she generally did not get to participate in easier to sell "citywide"[1] conventions and only sold conventions that were entirely in-house at the Aladdin. (Ex. 8 at 47:19-48:14)  Her sales numbers were better than some and not as good as others.  All in all, she was a good employee. (Ex. 7 at 102:6-8)

The convention sales National Sales Managers are the point people.  (Ex.8 at 19:4-17). They tend to get blamed and take fire when things go wrong. (Id.)  It is very common for them to receive complaints, sometimes in the form of letters from customers, and they do also receive positive letters. (Exhibit 16)  The customers often make complaints about the salespeople in an attempt to get concessions from the hotel or breaks on prices or contract terms. (Ex. 7 at 66:19 through 67:5) For example, in the case of CLT Meetings on the Sanofi convention, the hotel was owed about $556,000.00

---

[1] Citywide conventions are, for example, those that are held at the Convention Center and/or several venues and the hotel rents blocks of hotel rooms and/or other space in participation with the large convention.  These are easier to sell and salespersons get credit toward their goals for these even though they are easier.  Karen was generally not given the citywide conventions and the easier money that they brought in.

for "attrition"[2] due to the customer not filling all of the rooms that they had agreed would be filled. (Ex. 30) CLT Meetings is a third-party meeting planner that companies use to arrange their conventions or meetings for them.  Mature Health Communications, is another.  These customers that owe thousands of dollars for attrition have a clear motive to lie about and exaggerate problems with the meeting and the hotel's customer service in an attempt to get concessions such as getting the attrition charges reduced or waived. (Ex. 31; Ex 1)  This is exactly what happened in the case of both CLT and Mature Health. (Ex. 1; Ex. 32;  Ex. 15; Ex. 23)  Everybody involved at the hotel including Jim Lauster, although he now denies it, knew that the complaints were bogus and were aimed at getting concessions. (Id.)

### B.  Karen Gerving gets married and "has children."

Karen was single and had no children at the time she was hired by Jim Lauster and Maureen Robinson.

In May 2003 Karen got married.  Her new husband and she had been together for some time, but after she got married she took on the role of mother to her husband's three young daughters.  Their mother had passed away and after Karen's marriage to their father the relationship with the girls deepened into a more mother-daughters type of relationship.  Karen, in essence, became a "new mother."  She has no natural children of her own.

Karen's boss, Jim Lauster, came to her wedding. (Ex. 2) He did not know about the daughters before that and he did not know about the extent of Karen's new family responsibilities until the wedding or shortly after.

It was after Karen's wedding that she began to notice Jim Lauster treating her a lttle more coldly and sensed a definite difference in their working relationship.  In January 2004 Karen was given a

---

[2] Attrition is an amount of money, essentially contract damages, that a client owes to the hotel when the convention group does not fill its block of reserved rooms to the level called for in the contract.

coaching document. (Ex. 17) Karen did not totally agree with this and she wrote and submitted her comments. (Ex. 17)

### C. James Lauster's stereotyping, Karen's complaint to Aladdin HR, and Karen's termination from OpBiz.

Incorporated in its entirety here by reference is the timeline of events as prepared by Karen for the Nevada Equal Rights Commission, in her own words and as attached to her affidavit, for the time period of July 29, 2004 through March 22, 2005.  The parts that are most pertinent are as follows:

**Date:**         **August 2, 2004 at 4:15 p.m.**
**Where:** Office of  the Vice President of Sales, James Lauster
**Present:**        VP of Sales, James Lauster, DOS, Maureen Robinson and myself

Mr. Lauster told me that my job performance had declined since I became a mother and that I was exhibiting a lack of job performance because, I now had children and that my family was interfering with my job duties.  Mr.Lauster read out loud his statements written on the annual review document. I stated to both Ms. Robinson and Mr. Lauster that the review was not constructive but rather, a "Karen bashing" and asked that the attacks on my character and personal life end.  Mr. Lauster continued to make comments about women in the work force and working women who have children at home.

**At approximately 4:45 p.m. (30 minutes into the review process), Maureen Robinson, DOS, excused herself from the meeting and left.**

I continued to listen to Mr. Lauster's opinions of working mothers in society and hence, the reason for my lack of job performance.  Mr. Lauster told me that women are capable of equal job performance to men until they become mothers.  He told me that working mothers are not capable of performing their jobs to the same standards as men, or women with no children.  Mr. Lauster told me that corporations and children in our society are suffering because, of working mothers.

Mr. Lauster told me that I would be given a final coaching document in which he would set a thirty (30) day time frame for me to complete certain actions that he himself would establish.  He told me that these actions would be impossible to complete and hence, I needed to reconsider my priorities between my job and family and that my family should become my next job.

Mr. Lauster told me about his personal childhood experiences of when his mother passed away and how his father never remarried and that he, his brothers and father faced may hardships, because, of the lack of a mother in the home.  He told me that he knew first hand how children with working mothers are negatively affected by mothers working outside the home as he did not have a mother in the home.  Mr. Lauster informed me that his wife worked outside the home until she became pregnant. He told me that they had discussed the implications on children whose mother work outside the home and hence, the agreed that his wife would be a stay home mother and if she worked at all it would be from their home and only part time.

I asked Mr. Lauster for my bonus check and he informed that my lack of performance was his reason for withholding my bonus.  I told Mr.Lauster about my contracted compensation agreement with the Aladdin and stated that according to the terms, I was entitled to my bonus.  Mr. Lauster told me that he had the sole authority to grant me my bonus, or deny it, and that he was withholding the check based on my actions over the next thirty (30) days.  NOTE:  The terms of the compensation contract states that the bonus would be due and payable on July 15th based on the sales department meeting and exceeding revenue goals with no mention of conditions based on Mr. Lauster's discretion. All other eligible sales staff had received their bonus while I had not.

I listened, without comment, to Mr. Lauster's philosophy on working mothers in our society and his horrific accusations about my family life, my children and my work performance.

Mr. Lauster told me that step parents have many problems with parenting and since, I now was a full time step mother to three (3) children whose mother passed away that my place is in the home and not at a job that takes me away from these children who already have many problems.  Mr. Lauster told me that because my step children are girls that our family has even more problems than most families particularly, because their mother died and they are young girls who will soon be entering high and again, I should be home to mother them, protect and police their activities.

Mr. Lauster told me that my husband is not capable of taking care of three (3) young girls, which would be the case for all men in his situation, and adding to his problems of raising girls is the fact that my husband and I are now a newly married couple.  Hence, Mr. Lauster told me that I need to concentrate on my marriage and not my career and be a stay home mother and wife.

Mr. Lauster told me that my work performance over the last year had drastically declined because my personal life had drastically changed.  Mr. Lauster told me that he hired me when I was single and my personal responsibilities were minimal; therefore; I was qualified to perform my job duties.  Mr. Lauster told me that my personal life was not complicated with additional stress and responsibilities from being a newly married wife, a new full time mother and a step parent hence, my job performance was suffering, as would be the case for all women in my situation, and that I was not incapable of performing to the company's expectations.

Mr. Lauster told me that he had discussed the above reasons for my lack of job performance, on numerous occasions, with the Vice President  of Human Resources, Tracy Sapien and that Ms. Sapien agreed that such a drastic change in my life would be reasons why my performance could decline. Mr. Lauster told me that he and Ms. Sapien, talked about me getting psychological assistance and that the Aladdin could provide me and my family with counseling as it was apparent that I needed help.  Mr. Lauster told me that  would help me to understand the importance of my new role as a full time step mother and wife, and hence, realize that working mothers in our society are not helping their families but rather, creating conflicts for themselves, their jobs and their family.

I listened to Mr. Lauster's verbal abuse as he again repeated his statements made on my annual review document.  I listened to Mr. Lauster's dehumanizing tone and he was subjected to controlling and belittling demeanor as he continued his verbal attack, without evidence or proof of any kind.  I continued to listen to his statements without comments until 5:55 p.m. (1 hour and 40 minutes).

**Date:**          **Tuesday, August 3, 2004 at approximately 11:15 a.m. to**
                   **Approximately 11:35 a.m. (20 minutes)**

**Where:**     **Office of VP Sales, James Lauster**
**Present:**    **VP of Sales, James Lauster and myself**

Mr. Lauster informed me that someone in the office overheard an earlier conversation, on this same day, between me and my co-worker, Tara Wolff in which we exchanged information about Tara's previous annual reviews and my current annual review. Mr. Lauster told me that my and Tara's conversation was unacceptable and that my annual review meeting and his comments about my family and working mothers in our society was a private matter between himself and me.

Mr. Lauster told me that he had discussed my and Tara Wolff's conversation with the Vice President of Human Resources, Tracy Sapien, and that he the Aladdin would now take a more aggressive approach to my current employment. Mr. Lauster told me that a meeting had been scheduled for the end of the day with himself, the DOS, Maureen Robinson and the VP of HR, Tracy Sapien, Mr. Lauster informed me that the purpose of this meeting was to let me know the status of my employment which would be followed by the proper HR procedures for possible termination. Mr. Lauster told me that since, I became a working woman with children, that I have become dishonest, lacked trustworthiness, lacked respect from co-workers, and lacked job performance.

**Date:**    **Thursday, or Friday, August 12/13, 2004**
**Where:**    **Office of Human Resource Manager, Stacey Briand**
**Present:**    **Director of HR, Stacey Briand and myself**

I told the DHR, Stacey Briand, about my annual review meeting with the VP of Sales, James Lauster, and what was said to me. I told Ms. Briand about the meeting I had with him regarding mine and Tara's conversation, and the meetings I had with the DOS, Maureen Robinson. I told her what was said to me and by whom. I told Ms. Briand that Mr. Lauster told me that the Vice President of Human Resources, Tracy Sapien, was aware of the reasons for my lack of performance, etc and aware of a meeting that was to take place to discuss possible termination of my employment.

Ms. Biand told me that my HR file did not have the August 2, 2004 review document any other coaching documents or incidence/written reports from Mr. Lauster regarding my performance. I asked Ms. Briand for assistance as I felt that I was being sexually discriminated against because, I was a woman working outside the home who had children., I asked Ms. Briand to set up a meeting with the presence of HR myself, the DOS, Maureen Robinson and the VP of Sales, James Lauster, to explain how having a family was the reason for my lack of performance, to clarify my employment status with the Aladdin and to confirm the status of my bonus. A few days later, I provided Ms. Briand with copies of the documents I received from Mr. Lauster but, which were never processed through HR and hence, not present in my HR file.

**Date:**    **Tuesday, August 17, 2004 3:00 p.m.**
**Where:**    **An office located in the Human Resources Department**
**Present:**    **VP of Sales, James Lauster, Director of HR Stacy Briand, Vice President of HR, Tracy Sapien**.

Mr. Lauster handed me my bonus check in the present of the Director of HR, Stacey Briand and the VP of HR, Tracy Sapient, stating that the contractual compensation

9

Agreement I had with the hotel was binding even though he believed that I was not worthy of the bonus.

**Following the presentation of my bonus check, the DOS, Maureen Robinson, joined the meeting.**

Mr. Lauster stated the following accusations in reference to my job performance:

1.    Failure to follow up on Starwood leads
2.    Lack of attention to detail and
3.    Failure to follow office procedures in reference to booking assignments and booking approvals.

Three specific incidences of sales accounts were given as reasons for the above accusations; North Safety Products, Prentice Hall and the Sanofi accounts. I stated, and Ms. Robinson verbally confirmed, that the incidences regarding the accounts North Safety Products and Prentice Hall occurred when I was out of town traveling on business and that both incidences had been resolved with satisfactory results through the assistance of the DOS, Maureen Robinson, and my assistant, Autumn Barlion. No evidence was given to support the accusation that I failed to follow upon on Starwood leads nor any details provided for failure to follow office procedures regarding the Sanofi account. Note: On Saturday, August 14, 2004 (3 days prior to the above HR Meeting), Mr. Lauster sent me an email regarding the Sanofi account in which he stated "good job Karen".

Mt. Lauster stated that I had received excessive telephone calls from my children during office hours hence, the reason of how my family was interfering with my job performance. Ms. Robinson stated that she was told by someone on the sales staff that I seemed to have an excess of personal telephone calls and that co-workers seemed to know personal facts about my family. I denied the excessive telephone calls and stated that there are many personal facts known about all sales staff by all sales staff because, all sales staff work in a cubicle office environment which lends itself to gossip and knowledge about people's personal life and working habits. I challenged the Aladdin to check my telephone log stating that my personal calls are no more, or less, than anyone else in the department.

Mr. Lauster accused me of having excessive absences, doctors/dentist appointments. I stated that I believed I had not more or less than any one else in the office; however, from this point forward, I would record all personal time off, appointments, etc.

Mr. Lauster stated that his comments made tome during my review on August 2, 2004, about me being a working mother, etc. was said "off the record". Mr. Lauster stated that if I continued to bring attention to these comments that he would loose what little confidence he had left for me, and he strongly suggested that I take no further action.

There were no comments from VP of HR, Tracy Sapien or DHR, Stacey Briand. I was asked to leave the room and wait outside in the HR reception. Approximately, twenty (20) minutes later, I was called back into the meeting and presented a Final Coaching document of which I refused to sign.

**Date:                             Thursday, August 19, 2004**
**Where/Telephone Call:    Sales Office – my cubicle**
**Present:                         Director of HR, Stacey Briand, and myself**

I telephoned the DHR, Stacey Briand and asked her how my complaints about discrimination could result in a "final coaching document." Ms. Briand informed me that the final coaching document was relative to a January 5, 2004 coaching document. I also asked Ms. Briand for an explanation regarding my complaints about Mr. Lauster's statements and comments about how having a family was affecting my job performance. Ms. Briand told me that Mr. Lauster's statements of having children were relative to the claim of excessive personal telephone calls; however, this claim was dropped and no longer one of the reasons for a lack of job performance.

…

**Date:** September 2004 to March 18,2005
**Where:** Sales Department offices/Cublicles
**Present:** VP of Sales, James Lauster and myself

Over the next seven (7) months Mr. Lasuster continued to treat me badly. Mr. Lauster would shun me in the hallways as we passed, ignore me during meetings as if I wasn't present and make demenaning, and belittling, comments to me when discussing accounts/group business that I was working. Mr. Lauster continued to state in department meetings that he had an open door policy; however, his actions and attitude towards me exhibited such distrust, anger and attempts of controlling behavior towards my self esteem and respect that I was forced to seek more, and more, the assistance of the new DOS, Michelle Marsee in lieu of assistance from Mr. Lauster.

**Date:** March 18,2004
**Where:** Office of the Vice President of Sales, James Lauster
**Present:** VP of Sales, James Lauster, DOS, Michelle Marsee and myself

Mr. Lauster told me "he was done with me". He told me that I continued to have no respect from him, or my co-workers and that the was suspending me per his investigation for an incident with a co-worker, Leah Abbs (Convention Service/Catering Manager) in which termination for misconduct would be warranted. Mr. Lauster told me that the problems and issues noticed in the August 17th coaching document, and the August 2, 2004 annual review document, were continuing to happen and that the incident in question gives proof to the validity of these documents. Mr. Lauster told me that he would be terminated me based on my job performance and behavior noted on the above documents and misconduct. I was presented with a suspension document. No comments were made by the DOS, Michelle Marsee.

**Date:** March 21, 2004
**Where/Telephone Call:** My home
**Present:** Trinka Kuftedjian, HR representiatve (unsure of title) and myself

Ms. Kuftedjian told me that a meeting would be scheduled with Mr. Lauster, a HR representative and myself whereby, I would be informed about the status of my employment. I told Ms. Kuftedjian that Mr. Lauster made it perfectly clear that I would be terminated; therefore, a meeting with the presence of Mr. Lauster was not necessary as I would no longer subject myself to Mr. Lauster's verbal abuse and discriminatory comments, behavior and actions. A meeting was scheduled for 9:00 a.m. the next day, Tuesday, March 22, 2004 with me and Ms. Kuftedjian whereby, I would be presented with termination papers, etc.

**Date:**            **March 22, 2004**
**Where:**           **Office of Trinka Kuftedjian, HR representative (title?)**
**Present:**         **Ms. Kuftedjian and myself**

Ms. Kuftedjian presented me with termination papers dated March 21, 2004 of which I refused to sign. She gave my boxes of my personal desk items.  I asked for my vacation (PTO-personal time off) pay and she informed me that is "customary for strip properties not to pay for eared PTO when the employee is terminated".  I told her that I believed that I was legally entitled to PTO pay.  She told me that the hotel would not pay me for any earned PTO time.  She wished me luck and she escorted me out of the building.

**Overview:  My complaints of discrimination were ignored and instead of helping me to resolve my complaints I was written up for lack of job performance and ultimately terminated**.

     D.  <u>Charge of Discrimination and Retaliation.</u>

     Karen filed a complaint of discrimination with the Nevada Equal Rights Commission and the Equal Employment Opportunity Commission (EEOC) on or about August 20, 2005. (Ex.33) Karen contends that she was discriminated against in the terms and conditions of her employment because she is a woman and more particularly a woman with children.  Men with children, a specific example of this is Mike Rowland, were treated differently.   Karen has suffered damages including lost wages and emotional distress, shame, and mental anguish, and her damages continue.

     A Notice of Right to Sue letter was issued by the EEOC on or about April 13, 2006 (Ex. 34), and Karen received it in the mail approximately three days later.  This action was timely commenced in state court and the Defendant removed it to federal court.  The Defendant's acts, and Karen's damages, were motivated and caused, in whole or in part, by the Defendant's animus toward Karen because she is a woman, and more particularly a woman with children, and as such the acts constituted discrimination against Karen with respect to her compensation, terms, conditions, or privileges of employment in violation of 42 U.S.C.§ 2000e and NRS Chapter 613.

     The Defendant also retaliated against Karen by firing her under false pretenses and for pre-textual reasons and for opposing Jim Lauster's discriminatory stereotyping comments. All of this was done in retaliation for Karen having participated in an investigation into allegations of violations of

state and federal anti-discrimination statutes and constitutes violation of both federal and state anti-

discrimination anti-retaliation laws.

**E.   Corroboration and Comparator Evidence**

    **1.   Katiatu "Kadeja" Tejan.**

The Affidavit of Ms. Tejan (who goes by the nickname Kadeja) is attached hereto as Exhibit 3.

Ms. Tejan began work as a sales coordinator in about August 2003.  She worked with Karen.  She liked

working with Karen very much and found her to be a "really good person" with a good personality.

She was smart and respectable and really understood the staff.  Kadeja did not ever witness Karen

having any problems working with anyone in the office.  However, there were occasions when the

stress levels in the office were elevated and people would argue over workplace issues.  This was

nothing out of the ordinary for an office environment.

Kadeja's job at that time was in Jim Lauster's department.  Kadeja has first hand knowledge and

experience with Jim Lauster's discriminatory animus toward women and particularly women with

children.  In early 2005, just before Karen was fired, Kadeja learned of a "junior management" position

open in Jim Lauster's department.  Kadeja was pregnant at the time.  Kadeja went to talk to Jim Lauster

about the position.  The first words out of Jim Lauster's mouth were "what are you going to do? You

are going to have two kids; what are you going to do with your two kids?"  Mr. Lauster indicated that

with Kadeja having two children that she would not be able to take on the responsibility of the junior

position.  Kadeja told Jim that she had no problem with baby sitting, that her mom was going to help

her.  Jim told her that he would see and that it looked like it would be June before the position would

come available if at all.

Kadeja went on vacation in March 2005 (about the time that Karen was fired) and when she

came back Jim Lauster had given the job to a man named Anthony Earl who had less experience in the

department relevant to the job opening than Kadeja had.  Kadeja believes that the job was given to this

man in large part because he was a man and Jim Lauster wanted a man in the position.  Jim was not about to give the job to a pregnant woman.

Kadeja witnessed Jim passing women over for promotions.  He particularly would not promote women with children.  According to Kadeja if you were a woman with small children you had no chance with Jim Lauster.  His bias was very evident. (for all of the above see Affidavit of Katiatu Tejan attached hereto as Exhibit 3)

## 2.  Phyllis Johnson.

Phyllis Johnson's Affidavit is attached hereto as Exhibit 2.  Phyllis Johnson worked for Jim Lauster for approximately five years as his secretary.  Her affidavit is attached hereto as Exhibit 2.  Phyllis knows Karen to be a good person, well educated, and religious.  She does note that Karen was known to talk loudly in the office and this she attributes to Karen wearing a telephone headset.

As to Jim Lauster, she has formed the opinion that he is a male chauvinist.  She perceived that he treated women with children more harshly than men.  She gave an example of Michael Rowland who had a small child with health issues.  Michael would have to be absent from the office on occasion to care for his child and Jim Lauster never questioned it.  Karen on the other hand did receive criticism for having her step-children call her at work and for being absent occasionally for doctor appointments and/or illness.

Phyllis remembers that Karen's former assistant Madeline Madrid needed a short extension on her maternity leave.  Jim Lauster had the authority to grant the extension.  Jim refused to grant the extension even though Madeline was, by all accounts, an excellent employee.  Karen was instead left with an assistant who was really not qualified for the job.  Karen wanted Jim to extend Madeline's leave and Jim flatly refused.  Karen believes that this was not only discriminatory to Madeline, but also done to make Karen's life more difficult at work by leaving her with an unqualified assistant.

Phyllis also has concluded, based on observation, that Jim Lauster has a drinking problem and was absent from work a lot. She says that on many days Jim would only be in the office between about 10:00 a.m. and 2:00 p.m.

Accordingly, Phyllis will establish that Mr. Lauster treated women with children different than men with children. She will establish that Mr. Lauster is a chauvinist in his views toward women. She will establish that Mr. Lauster's observations about Karen and her performance were clouded by his biased attitude toward women, his drinking problem, and his not being at work very much.

### 3. Tara Wolff.

Tara Wolff was another Sales Manager who worked with Karen. She testified at deposition that it was not uncommon for Sales Managers at the Aladdin to get a couple of complaints from customers every month. (Ex. 8 at 18:22 through 19:3; Ex. 7 at 72:17 through 73:8) Very often the salesperson would be blamed by customers for things that were beyond the salesperson's control. (Ex.8 at 19:4-17). Tension would often arise when, for example, the customer was hit with a bill for attrition for unused rooms. (Ex. 8 at 46:9-13).

With regard to whether or not yelling and profanity were accepted in the workplace, Tara witnessed Vice President of Sales Jim Lauster yelling at and using profanity with Director of Sales Maureen Robinson. (Ex. 8 at 21:6-19; Ex. 7 at 31:9 through 32:9) Profanity was quite acceptable in the workplace at the Aladdin Convention Sales Office (Ex. 8 at 21:21 through 22:2) Tara never saw or knew of anybody having been written up or disciplined for using profanity; the workplace was a very free speaking environment. (Ex 8 at 22:4-11)

As to sales leads, Tara testified that the Sales Managers would receive 15-30 per day and the policy was to respond to leads within 48 hours; however, it was not always possible to do so. (Ex. 8 at 25:4-19) Maureen Robinson also testified that it was impossible to always respond to all customers in a timely manner. (Ex. 7 at 95 through 96) Further, there were many problems with the leads coming in

from Starwood, with whom Aladdin had a management agreement.  (Ex. 8 at 37:13-39:25)  There was much confusion for months after they started to receive these leads (Id.)  This included receiving duplicate leads given to different Sales Managers with customers being contacted by both and giving conflicting information (Id.)

As far as management style, Tara testified that Jim Lauster was on again off again and he was often gone and not available.  (Ex. 8 at 26:22-27:5)  She also testified that Jim Lauster's schedule was very sporadic and inconsistent (Ex. 8 at 40:4-41:3)  Tara sensed or had the impression from time to time that Jim Lauster had been drinking on the job. (Ex. 8 at 41:4-11).  This was also confirmed by Maureen Robinson (Ex. 7 at 35:20 through 36:16) and by Karen (Ex. 1).  Karen also states in her affidavit that Jim Lauster was a marijuana smoker and would make reference during sales meetings to the fact that he smoked pot and that he would sometimes miss work while the drugs and/or alcohol were wearing off and leaving his system.  (Ex. 1)  Phyllis Johnson, Mr. Lauster's secretary believed that Mr. Lauster had a drinking problem (Ex. 2)

Tara Wolff also testified that Karen told her that Jim Lauster said she should be a stay at home mom.  (Ex.8 at 29:20-25)  Karen said to Tara that she was told "either you have to be a mother or you can work here." (Ex. 8 at 30:2-15)

Tara had a 14 year old daughter at that time (2004) (Ex.8 at 35:13-25).  **NONE OF THE OTHER WOMEN MANAGERS IN THE OFFICE HAD SMALL CHILDREN** (Ex. 1)  The other _women_ that had small children were not managers.  The other _managers_ that had children had teenagers or grown children.  The only other Sales Manager that had a small child was a man named Michael Rowland who had a special needs child.  (Ex. 8 at 35:12-37:6)  Michael was not criticized when he had to leave work to take his child to doctor appointments and/or to care for his child, but women with children in the office (including the non-managers that had small children) were criticized (Id; Ex. 2; Ex. 3)

16

### 4.  **Leah Abbs.**

One of the reasons why Defendant claims that it fired Karen is that she had a loud discussion with Leah Abbs in the work area wherein some profanity was used.  (Ex. 2)  This is a complete farce. The entire office including Vice President Jim Lauster engages in profanity laced conversations and arguments with one another (Ex 7 at 31:9 through 32:9; Ex. 6 at 43:2 through 44:13)  Jim Lauster has never been so much as written up for using profanity in the workplace (Id.) yet he claims that using profanity was a terminable offense in Karen's case.  Even Leah Abbs herself has testified that the incident was no big deal and she was surprised that Karen got fired over it.  (Ex. 5 at 8:9-11)  Karen was awarded unemployment insurance because this was <u>not</u> deemed to be misconduct related to the work.

### F.  **Facts as to Contract Claim.**

While she worked at the Aladdin, including the time that she worked for Defendant OpBiz, LLC after it took over from the previous employer, Karen earned vacation time or "paid time off" (PTO)  This was reflected on her pay stubs.  (Ex. 28) She had done everything, from a contract performance standpoint, to earn the vacation or PTO.  When she was terminated the Human Resources representative who performed this task for the Defendant, Katrinka Kuftedjian, acknowledged to Karen that she had earned PTO, but that based upon the Defendant's understanding that it was customary on the Las Vegas Strip to not pay earned PTO to a terminated employee, that the Defendant refused to pay her for what she had earned which was $2,150.48. (Ex. 1)  They did pay if an employee quit and gave proper notice.  The policy has now changed and the Defendant would now pay out the PTO to an employee fired as Karen was. (Ex. 11 at 52:21-25)

## II.   LEGAL ARGUMENT

### A.      SUMMARY JUDGMENT

Federal Rules of Civil Procedure, Rule 56, states in relevant part as follows:

**Rule 56. Summary Judgment**

...
(b) For Defending Party.
A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.
(c) Motion and Proceedings Thereon.
The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

There are genuine issues of material fact to be determined by the trier of fact prior to any legal determinations that may flow from that set of facts; summary judgment is inappropriate and should be denied in this case.

**B. SUMMARY JUDGMENT SHOULD BE DENIED AS TO PLAINTIFF'S CLAIMS BECAUSE THE FACTS THAT HE ALLEGES DO MAKE OUT PRIMA FACIE CASES FOR ALL OF THE CLAIMS ASSERTED AND LIABILITY WILL FLOW FROM THOSE FACTS WHEN THEY ARE ESTABLISHED AT TRIAL.**

**1. <u>Plaintiff makes out a case for Gender Discrimination, Discrimination based on "Sex," under both Federal and Nevada Law.</u>**

Title VII of the Civil Rights Act of 1964, and NRS 613.330, make discrimination by an employer on the basis of Sex (usually referred to herein as gender discrimination) illegal and subjects a discriminating employer to civil liability under 42 U.S.C.A. § 2000e-2:

(a) Employer practices
It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, **<u>sex</u>**, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, **<u>sex</u>**, or national origin.

42 U.S.C.A. § 2000e-2 (emphasis added)

This case presents an issue of gender discrimination based upon stereotyping of women with small children and family responsibilities.  This case very nearly tracks exactly a case from the Second Circuit, <u>Back v. Hastings On Hudson Union Free School Dist</u>.,  365 F.3d 107, (C.A.2 (N.Y.),2004) There is little likelihood that this brief will do justice to Judge Calabresi's opinion, so the court is specially requested to read the case in its entirety.

The only differences are that the <u>Back</u> case dealt with a school psychologist that was effectively fired when she was denied tenure and the that the claims in that case were gender discrimination under 42 U.S.C.A § 1983 rather than Title VII.  Everything else about the two cases tracks nearly identically. As to the differences in the law, they are irrelevant because the court held that the way to evaluate the 1983 action was exactly the same as a Title VII case:

> In assessing Back's claim, we rely upon the familiar *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Sorlucco v. New York City Police Dep't,* 888 F.2d 4, 7 (2d Cir.1989) (holding that the *McDonnell Douglas* framework applies to § 1983 cases).

<u>Back v. Hastings On Hudson Union Free School Dist.</u>  365 F.3d 107, *123 (C.A.2 (N.Y.),2004)

> We therefore inquire first whether the plaintiff has successfully asserted a prima facie case of gender discrimination against these defendants. " '[A] plaintiff may rely on direct evidence of what the defendant did and said' in satisfying her initial burden under *McDonnell Douglas.*" *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 77 (2d Cir.2001) (quoting *Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000)). Once a plaintiff makes out a prima facie case of discrimination, the defendants have the burden of showing a legitimate, nondiscriminatory reason for their actions. In order to prevent summary judgment in favor of the plaintiff at this stage, that explanation must, if taken as true, " *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

<u>Back v. Hastings On Hudson Union Free School Dist.</u>  365 F.3d 107, *123 (C.A.2 (N.Y.),2004)

> The plaintiff then has the opportunity to prove "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Of course, "[t]o defeat summary judgment within the *McDonnell Douglas* framework ··· the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *See Holtz,* 258 F.3d at 78 (internal quotation marks omitted). Regardless of whether the plaintiff can prove pretext, she or he bears the

ultimate burden of persuasion, and must adduce enough evidence of discrimination so that a rational fact finder can conclude that the adverse job action was more probably than not caused by discrimination. *See St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742 (holding that "rejection of the defendant's proffered reasons [for the adverse action] will *permit* the trier of fact to infer the ultimate fact of intentional discrimination" but does not " *compel* [ ]" this inference); *Fisher,* 114 F.3d at 1336 (stating that, after the defendant proffers a legitimate, non-discriminatory reason for the action, "[t]he question becomes the same question asked in any other civil case: Has the plaintiff shown, by a preponderance of the evidence, that the defendant is liable for the alleged conduct?").

<u>Back v. Hastings On Hudson Union Free School Dist.</u>  365 F.3d 107, *123 (C.A.2 (N.Y.),2004)

The basic facts of <u>Back</u> are that the plaintiff there was a school psychologist who was denied tenured status, which effectively terminated her employment.  The supervisors who recommended that tenure be denied (which was accepted by the actual decision makers without any real question) were both women.  Ms. Back received favorable reviews up until she returned from a maternity leave.  At that time the supervisors began to question her about her plans for having further children.  They began to question her commitment to the job and the hours that it would require of her.  They expressed dout that she could do the job with young children at home.  They stated that it would be impossible for her to be a good mother and do the job.  In short the supervisors expressed stereotypes and applied these stereotypes to Ms. Back.  They began to give her unfavorable reviews and called her performance into question.  They solicited complaint letters from parents.  They called her competence into question.  They called her immature, defensive, unprofessional, and difficult to get along with.  The Second Circuit reversed the trial court's summary judgment on key issues based upon the fact that Ms. Back has shown clearly that she was subjected to gender stereotyping based upon her family responsibilities.

It is the law, then, that "stereotyped remarks can certainly be evidence that gender played a part" in an adverse employment decision. [*Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ]at 251, 109 S.Ct. 1775 (italics omitted). The principle of *Price Waterhouse,* furthermore, applies as much to the supposition that a woman *will* conform to a gender stereotype (and therefore will not, for example, be dedicated to her job), as to the supposition that a woman is unqualified for a position because she does *not*

conform to a gender stereotype.

Back v. Hastings On Hudson Union Free School Dist. 365 F.3d 107, *119 (C.A.2 (N.Y.),2004) (citations omitted)

In this case Karen makes out her prima facie case. There is no doubt that she meets her burden of persuasion. She does so by presenting direct evidence that James Lauster, her superior and supervisor engaged in stereotyping against her. He has a pattern of stereotyping, in fact having not only stereotyped against Karen, but also Katiatu Tejan by denying her a promotion based upon the fact that she had one small child at home and against Madeline Madrid by not allowing her leave, that was within his discretion to grant, for the remainder of her recovery from maternity. He has a history of treating women more harshly than men in the workplace. (Ex. 2; Ex. 3)  Although no corroboration is necessary in a case where the evidence of discrimination is direct, Back, 365 F.3d at 124 (C.A.2 (N.Y.),2004) Exhibit 13, the handwritten notes of Stacey Briand from August 17, 2004 (authenticated Ex. 9 at 35:5-18) corroborate Karen's testimony and affidavit that Lauster made the stereotyped comments.

Lauster specifically told Karen that she was not capable of doing the job of a National Sales Manager at the Aladdin if she was going to be the mother to small children as she now had given her marriage to her husband in May 2003. He told her that she should be a stay at home mom because she would not be committed to her job. He told her in August 2004 that he was going to go through the steps to fire her. He admitted at his deposition that he would have fired her in August 2004 if the President of Aladdin would have signed off on it. He was clearly stereotyping her in August 2004. He ultimately had to back off and delay completing his discriminatory actions until a little over six months later, only because he could not get the signatures that he needed to terminate her at that time due to the impending management change. Seven months later he finally had the pull to get her fired.

The instant case, however, foregrounds a crucial question: What constitutes*120 a "gender-based stereotype"? *Price Waterhouse* suggested that this question

must be answered in the particular context in which it arises, and without undue formalization. We have adopted the same approach, as have other circuits. Just as "[i]t takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring 'a course at charm school,' " *Price Waterhouse,* 490 U.S. at 256, 109 S.Ct. 1775, so it takes no special training to discern stereotyping in the view that a woman cannot "be a good mother" and have a job that requires long hours, or in the statement that a mother who received tenure "would not show the same level of commitment [she] had shown because [she] had little ones at home." These are not the kind of "innocuous words" that we have previously held to be insufficient, as a matter of law, to provide evidence of discriminatory intent. *See Weinstock,* 224 F.3d at 45.

Back v. Hastings On Hudson Union Free School Dist.  365 F.3d 107, *120 (C.A.2 (N.Y.),2004) (footnote omitted)

There is no doubt that Karen, just like Ms. Back was subjected to gender stereotyping. It does not take any special training to understand what Jim Lauster was saying and to understand that he was discriminating against Karen in violation of Title VII. His own personal bias and prejudice colored everything that he saw Karen do. That is why the Defendant's claims that Karen was a poor performer, did not get along with customers, and had an inappropriate confrontation with a coworker, are all pretextual. The Back case discusses this phenomenon:

> FN16. Such a decline may be particularly meaningful in the context of a stereotyping claim. Studies have demonstrated that stereotypes are associated with "cognitive biases," which cause people to ignore or exclude information that is inconsistent with a stereotype. *See, e.g.,* Madeline E. Heilman, *Sex Stereotypes and Their Effects in the Workplace: What We Know and What We Don't Know,* 10 J. Soc. Behav. & Personality 3, 4-7 (1995). Even a subtle reversal in evaluations that is consistent with stereotypical views about mothers, therefore (for example, that an employee no longer seems dedicated to her work, or is no longer able to work efficiently or complete her work in a timely fashion) suggests pretext. That *this* particular pretext was chosen, additionally, supports the conclusion that discrimination was the real reason for the adverse action. *See Fisher v. Vassar Coll.,* 114 F.3d 1332, 1360 n. 12 (2d Cir.1997) (Calabresi, J., concurring in part and dissenting in part) (suggesting that "a bare finding that a false answer is plausibly connected to an offensive stereotype makes that false answer considerably more probative of discrimination than a pretextual answer that is unconnected to such a stereotype").

Back v. Hastings On Hudson Union Free School Dist.  365 F.3d 107, *125 (C.A.2 (N.Y.),2004)

Just like the parent complaints in Back, the Defendant here claims that it received customer complaints related to Karen. First, Karen objects to the letters from CLT and MatureHealth on the basis that they are hearsay, rank hearsay. Defendant should have to produce those witnesses and make

them subject to cross examination.  Karen refutes both of these letters and did so at the time.

Geraldine Sandman has provided a statement (Ex. 15) and an affidavit (Exhibit 23) to show that the

complaints of CLT were bogus or trumped up and were complaints designed to elicit a reduction in the

liability of CLT's client Sanofi.  Geraldine Sandman was privy to conversations with Jim Lauster where

he stated that the complaints were bogus and were a prelude to a request for concessions on the liability

owed to the hotel of about $556,000.00.  She also states that the complaint letter was solicited by

Joanna Berens at Starwood who did a lot of business with CLT.  This is similar to the facts in the <u>Back</u>

case where letters from parents complaining about Ms. Back were solicited by her supervisor.

     The Mature Health Letter is similarly not Karen's fault.  Karen provided a detailed statement

refuting each of the complaints made about her and showing that the complaints were in substance

about problems that were caused by other departments in the hotel. (Ex. 32)

     Further, the Leah Abbs incident is totally pretextual.  Nobody gets fired at Aladdin for

profanity.  Leah Abbs herself was surprised that Karen was allegedly fired for the conversation that

they had had that day. (Ex. 5 at 8:9-11)

> A plaintiff may prove pretext either directly by persuading the court that a
> discriminatory reason more likely motivated the employer or indirectly by
> showing that the employer's proffered explanation is unworthy of credence.
> The evidence proffered can be circumstantial or direct.  When the plaintiff offers
> direct evidence of discriminatory motive, a triable issue as to the actual
> motivation of the employer is created even if the evidence is not substantial····
> Direct evidence is evidence, which, if believed, proves the fact of discriminatory
> animus without inference or presumption. Where direct evidence is unavailable,
> however, the plaintiff may come forward with circumstantial evidence ··· to show
> that the employer's proffered motives were not the actual motives because they
> are inconsistent or otherwise not believable. Such evidence ··· must be 'specific'
> and 'substantial' in order to create a triable issue with respect to whether the
> employer intended to discriminate on the basis of a prohibited ground.

<u>Bodett v. CoxCom, Inc.</u>,  366 F.3d 736, *743 (C.A.9 (Ariz.),2004) (Internal Quotations and
Citations omitted)

     In this case Karen has offered direct evidence of discriminatory motive. (Ex. 1; Ex. 2; Ex. 3;

Ex.13; Ex. 14)  James Lauster, Vice President of Sales for OpBiz had discriminatory animus and Karen

has proven this through the evidence of his stereotyping words and conduct  Thus there is a triable

issue of fact and summary judgment must be denied.  Further, Karen has presented direct and

circumstantial evidence that the reasons proffered by the Defendant for her termination are not worthy

of credence.  The Leah Abbs incident was not a terminable offense in that company. (Ex. 12 at 24:17

through 25:17) The Mature Health and CLT complaint letters are rank hearsay and as a reason to

terminate Karen are not worthy of credence as there is persuasive evidence (Ex. 15 and Ex. 23) that Jim

Lauster knew that the complaints were bogus and merely attempts to negotiate concessions over the

bills with the hotel. (Ex. 1)  Any other "performance" issues are from before OpBiz, LLC took over

and, according to the Defendant, should not be relevant.  Karen's Director of Sales Michelle Marsee at

the time of her termination knew of no problems with Karen's performance and had not had to write

Karen up at all.  (Ex.12 at 21:9-24)  Jim Lauster never told Ms. Marsee that there were any performance

issues or problems with Karen until the day he suspended Karen a few days before she was fired.  (Id.;

Id. at 28:8 through 29:20)

Any argument by Defendant that Lauster's stereotyped statements were "stray remarks" should

likewise be discarded, just as it was in <u>Back</u>:

> FN12. The district court inaccurately characterized Brennan and Wishnie's
> purported statements about Back's inability to combine work and motherhood as
> "stray remarks." [JA 13] The comments alleged were (1) made repeatedly, (2)
> drew a direct link between gender stereotypes and the conclusion that Back
> should not be tenured, and (3) were made by supervisors who played a
> substantial role in the decision to terminate. As such, they are sufficient to
> support a finding of discriminatory motive. *Cf. Rose v. New York City Bd. of
> Educ.,* 257 F.3d 156, 162 (2d Cir.2001).

<u>Back v. Hastings On Hudson Union Free School Dist.</u>  365 F.3d 107, *125 (C.A.2 (N.Y.),2004)

Also, <u>Back</u> makes clear that while having comparators, as Karen does in the form of

Mike Rowland, can make the case stronger, comparators are not necessary in a case like this

where there is direct evidence of discriminatory motive.  <u>Back v. Hastings On Hudson Union

Free School Dist</u>. 365 F.3d 107, *121 -122 (C.A.2 (N.Y.),2004)  The <u>Back </u>court held that the

24

argument that other women had children, as the Defendant argues here, is not very probative without knowing the ages of the other children and whether or not the other mothers were working in the same type of position. Id.  Here, Karen has established that none of the other Sales Managers had small children, except for Mike Rowland and he was treated better than Karen.

Also, the Defendant cannot argue that Lauster was not the ultimate decision maker.  He clearly participated in the termination process in a meaningful way (Response to Request for Admission No. 4, Ex. 26)

> it is clear that "impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision ···· even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful *126 role in the ··· process." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 450 (2d Cir.1999).

Back v. Hastings On Hudson Union Free School Dist. 365 F.3d 107, *125 -126 (C.A.2 (N.Y.),2004)

The affirmative defense under Ellerth is not available because Jim Lauster was a supervisor and therefore acts as the company with regard to Karen's employement:

> "[n]o affirmative defense is available ··· when the supervisor's harassment culminates in a tangible employment action." [Ellerth] at 765, 118 S.Ct. at 2270. Thus, while the defense may be available when the employer can disclaim liability for a hostile environment created by a supervisor in contravention of company policy, it is not available to allow the employer to escape liability for discriminatory tangible employment actions, because such actions are necessarily those of the company itself.

Passantino v. Johnson & Johnson Consumer Products, Inc. 212 F.3d 493, *507 (C.A.9 (Wash.),2000)  (footnote omitted)

The court should deny the Motion for Summary Judgment as to the Gender or "Sex" Discrimination claim.  The matters raised above are clearly genuine issues of material fact for the jury to decide based upon the circumstances and credibility of the witnesses and the Defendant is not entitled to judgment as a matter of law.

**2.      The Plaintiff makes out a prima facie case for Retaliation under both Federal and State discrimination law.**

42 U.S.C.A. § 2000e-3 states in relevant part as follows:

> **(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings**
>
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment. . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C.A. § 2000e-3

Nevada Revised Statutes section 613.340 (1) states in relevant part as follows:

> **NRS 613.340  Unlawful employment practices: Discrimination for opposing unlawful practice or assisting investigation; printing or publication of material indicating prohibited discrimination.**
> 1.  It is an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by NRS 613.310 to 613.435, inclusive, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under NRS 613.310 to 613.435, inclusive.

In this case Karen opposed Jim Lauster's illegal stereotyping of her and his attempts to fire her for discriminatory reasons.  The notes of Karen's meeting with Stacey Briand in HR on August 12, 2004, clearly show that she complained that Jim had given her a horrific review and then told her that he intended to see her fired within a short period of time after he gave her unattainable goals (Ex. 13) This was because of his stereotypical thinking that Karen should be a stay at home mother and not work, certainly not work as a National Sales Manager at the Aladdin.  Jim Lauster was confronted with this on August 17, 2004 in the meeting between Karen, Stacey Briand, Tracy Sapien, Maureen Robinson, and Jim Lauster (Ex 14 at bates stamped page 280) and he got angry that she had brought the matter to the attention of HR saying that he had, "lost all trust" in Karen for bringing the matter up.  This is clear evidence of a motive to retaliate.  The fact is that new management was coming in to

the hotel two weeks after that meeting.  True to his words to Karen that he would give her tasks that she would not be able to complete and have her out in 30 days, Jim did try to have Karen terminated on August 25, 2004. (Ex. 20)  Lauster testified that he considered Karen terminated at that time (Ex. 6 at 103-107).  However without the president's signature and with new ownership coming in, he simply could not affect the termination until seven months later.  Her termination in March 2005 is the adverse employment action needed for a retaliation claim.  Under Title VII Lauster is the employer.  42 U.S.C.A. § 2000 e (b)  That is true whether or not it was the old owners or the new owners.  He retaliated against Karen.  OpBiz, LLC is responsible for that. <u>Passantino v. Johnson & Johnson Consumer Products, Inc</u>.  212 F.3d 493, *507 (C.A.9 (Wash.),2000)

It is clear that there are genuine material issues of fact to be determined in this case and the Defendants are not entitled to judgment as a matter of law.  This case should go forward and the Motion for Summary Judgment should be denied.

### 3.   <u>The Plaintiff states a claim for Breach of Contract for her earned and unpaid vacation or paid time off and the Motion for Summary Judgment should be denied.</u>

This is very simple.  While she worked at the Aladdin, including the time that she worked for Defendant OpBiz, LLC after it took over from the previous employer, Karen earned vacation time or "paid time off" (PTO)  This was reflected on her pay stubs.  She had done everything, from a contract performance standpoint, to earn the vacation or PTO.  When she was terminated the Human Resources representative who performed this task for the Defendant, Katrinka Kuftedjian, acknowledged to Karen that she had earned PTO, but that based upon the Defendant's understanding that it was customary on the Las Vegas Strip to not pay earned PTO to a terminated employee, that the Defendant refused to pay her for what she had earned which was $2,150.48.  They do pay if an employee quits and gives proper notice.

This is a breach of contract:  1) Offer—the employer promised workers including Karen that if they performed services for a specific period of time that they would earn paid time off or vacation pay; 2) Acceptance—Karen worked and continued in employment for the requisite period of time to earn the paid time off or vacation pay; and 3) Consideration—Karen performed her job and the paid time off or vacation was part of the compensation that she was to earn.

It is unacceptable as a matter of policy and as a matter of law for the Defendant to simply declare the earned compensation forfeited:

**NRS 608.100  Unlawful decrease in compensation by employer; unlawful requirement to rebate compensation; prerequisites to lawfully decreasing compensation.**
1.  It is unlawful for any employer to:
(a) Pay a lower wage, salary or compensation to an employee than the amount agreed upon through a collective bargaining agreement, if any;
(b) Pay a lower wage, salary or compensation to an employee than the amount that the employer is required to pay to the employee by virtue of any statute or regulation **or by contract between the employer and the employee**; or
(c) **Pay a lower wage, salary or compensation to an employee than the amount earned by the employee when the work was performed.**
2.  It is unlawful for any employer to require an employee to rebate, refund or return any part of the wage, salary or compensation earned by and paid to the employee.
3.  It is unlawful for any employer who has the legal authority to decrease the wage, salary or compensation of an employee to implement such a decrease unless:
(a) Not less than 7 days before the employee performs any work at the decreased wage, salary or compensation, the employer provides the employee with written notice of the decrease; or
(b) The employer complies with the requirements relating to the decrease that are imposed on the employer pursuant to the provisions of any collective bargaining agreement or any contract between the employer and the employee.

Not only has the Defendant employer breached the contract with Karen, it has also violated the law by not paying her the compensation that she has earned.  Summary judgment must be denied on this claim.  While there may be no genuine issue of material facts in dispute, the Defendant is not entitled to judgment as a matter of law.  On the contrary, Karen is entitled to judgment as a matter of law and hereby moves that the court grant summary judgment in her favor on this claim.

**C. THE DEFENDANT'S ARGUMENTS REGARDING PLAINTIFF PURSUING THE WRONG ENTITY ARE A RED HERRING AND SHOULD BE DISREGARDED BY THE COURT FOR LACK OF MERIT AND LACK OF PROPER SUPPORT.**

The Defendant makes nonsensical arguments that Plaintiff has sued the wrong entity.  The court should disregard this "smoke and mirrors" approach.  It is totally devoid of merit.

1. **Karen Gerving and James Lauster were both employees of OpBiz, LLC. at the time of Karen's termination, the discriminatory and retaliatory act at issue.**

At the time that Karen Gerving was fired, she was a National Sales Manager employed by OpBiz, LLC.  James Lauster was the Vice President of Sales for convention sales employed  by OpBiz. He was Karen's superior and supervisor (noting that the Director of Sales was also her supervisor). Thus, both Karen and the OpBiz, LLC executive that discriminated and retaliated against her were employees of OpBiz.  Under the definition of "employer" in Title VII, Jim Lauster was also Karen's employer.  42 U.S.C.A. § 2000e (b)  However, there is no individual liability under Title VII.  Seib v. Elko Motor Inn, Inc., 648 F.Supp. 272 (D.NV 1986)  Thus, the question to OpBiz is "who would Karen sue for firing her in a discriminatory and retaliatory manner if not OpBiz?"  Karen did ask that question.  Several times in discovery she asked that question.  (Ex.24, 25, 26)

OpBiz, LLC is the proper defendant in this case.  Karen was discriminated against and retaliated against and suffered adverse employment actions (namely termination) while she and Mr. Lauster were both employed by OpBiz, LLC.  The Defendant, hypocritically, says out of one side of its mouth that it is not responsible for anything that happened prior to September 1, 2004 and out of the other side of its mouth says that Karen is properly held responsible for everything that she allegedly did for her former employer prior to September 1, 2004.

What is important about the events at the Aladdin prior to September 1, 2004 is that Jim Lauster showed his true colors and expressed his stereotypical thinking about women with small children being in the workplace, particularly women who are managers with small children being in the

workplace, and specifically Karen Gerving, now acting as a mother to small children and being a

manager in HIS workplace.

### 2. Defendant has waived any right to make these arguments by failing to candidly answer discovery requests regarding these issues.

The court should look at Exhibits 24, 25, and 26 which are the Defendant's "Objections and

Responses" to written discovery requests and see exactly the kind of egregious discovery abuses that

the Defendant engages in.  Specifically Request for Production number 4 and Interrogatory number 9

ask for the Defendant's rationale for why it contends that it is not the proper defendant and for any

documents that support its contentions.  Defendant simply spewed forth its standard blanket

objections and then, subject to the improper objections, made some non-responsive statements that

amounted to saying, "go find out for yourself."

Defendant's failure to candidly answer discovery requests and to now attempt to rely on

information, witnesses, and documents that it willfully suppressed in discovery should be construed by

the court as a waiver of its contention that it is not a proper defendant party to this lawsuit.  The court

should do this as a proper sanction under FRCP Rule 37 for discovery abuses.

III.     CONCLUSION

Based upon the foregoing, the Court should DENY the Defendant's Motion for Summary

Judgment. .

DATED February 12, 2007.

/s/ James P. Kemp
JAMES P. KEMP, ESQ.
Nevada Bar No. 6375
KEMP & KEMP, Attorneys at Law
624 N. Rainbow Blvd.
Las Vegas, Nevada 89107
(702) 258-1183/fax 258-6983
jp@kemp-attorneys.com
Attorney for Plaintiff